Filed 9/2/15  In re C.B. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re C.B. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> N.B., <br><br>     Defendant and Appellant. | A142238, A142718 <br><br> (Alameda County Super. Ct. Nos. OJ12018583, OJ12018584) |

In this dependency proceeding involving minors C.B. and J.M., girls born in 2010 and 2011 respectively, the juvenile court entered an order terminating reunification services to the minors' mother, N.B. (Mother), and setting a permanency planning hearing under Welfare and Institutions Code section 366.26.[1]  Mother filed a section 388 petition to modify the court's order.  The court denied the petition.  At the conclusion of the subsequent section 366.26 hearing, the court found the minors were adoptable and terminated Mother's parental rights.

In these consolidated appeals, Mother challenges the orders denying her section 388 petition and terminating her parental rights.  Mother contends (1) the Alameda

_____

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

1

County Social Services Agency (Agency) did not provide her with reasonable reunification services, because Agency did not refer Mother to the regional center for persons with developmental disabilities or help her apply to the center, and (2) the court's finding that the minors are likely to be adopted is not supported by substantial evidence. We affirm the juvenile court's orders.

## I.  BACKGROUND

Agency filed the initial dependency petition in this matter on March 15, 2012, and later amended it three times.  The third amended petition, filed on May 23, 2012, alleged C.B. and J.M. were dependents under section 300, because Mother had failed or was unable to protect or supervise them adequately (§ 300, subd. (b)) and it was unknown whether the minors' alleged fathers were able to care for them (*id*., subd. (g)).  The third amended petition alleged Mother "has a history of involvement with the criminal justice system, housing instability, mental health issues, and substance abuse issues that impacts her ability to adequately protect and care for the minors[.]"  Specifically, the petition alleged (1) Mother had been arrested in July 2011 for riding with J.M. in a vehicle driven by an intoxicated person and failing to attach J.M.'s car seat to the back seat of the vehicle, (2) Mother had a history of lacking a safe and stable home, and she and the minors had been living with Mother's mother (the maternal grandmother), which presented a risk to the children due to the grandmother's mental health issues, substance abuse issues and dependency history with her own children, (3) Mother had a history of psychiatric hospitalizations, and her behavior was consistent with an ongoing mental illness, for which she had not obtained treatment, and (4) Mother had a history of marijuana use, and C.B. tested positive for marijuana at birth.  Mother also had a history of allowing C.B. to be cared for by the maternal grandmother, who was an inappropriate caretaker due to her mental health and substance abuse issues.

The reports prepared by Agency for the March 19, 2012 initial hearing on the original petition and for a March 22, 2012 detention hearing described the family's prior contacts with the Agency.  As to maternal grandmother, Agency had received numerous referrals over the years alleging abuse or neglect of Mother and her siblings, and Agency

2

had "open case[s]" and family maintenance cases for maternal grandmother's children at various times. As to Mother, in June 2010 Agency investigated allegations of general neglect of C.B. (who was then two months old); Agency found the allegations to be inconclusive. During that investigation, maternal grandmother stated that she had been caring for C.B. and that Mother sometimes came to her home " 'loaded' " on alcohol, marijuana or pills. Maternal grandmother stated Mother yelled at C.B. and once threatened to throw C.B. out the window. Mother accused maternal grandmother of making up allegations to get custody of C.B.

In August 2011, in response to a referral from the probate court (where maternal grandmother was seeking permanent guardianship of C.B.), Agency began another investigation of the family. C.B. apparently was staying primarily with maternal grandmother at that time. During the investigation, maternal grandmother reported that C.B. had minimal contact with Mother, who only came by her home approximately twice per month to shower or eat, but did not engage with C.B. Agency closed the referral, finding the allegation of general neglect unfounded.

In September 2011, the probate court denied maternal grandmother's request for permanent guardianship of C.B. The probate court directed C.B.'s counsel to apply to the juvenile court to review the social worker's decision not to commence dependency proceedings (see § 331).

Also in September 2011 (and apparently independently of the probate court proceedings), Agency investigated an allegation of general neglect of J.M. The social worker who conducted that investigation ultimately closed the referral as unfounded. The social worker stated that, during this investigation, Mother "presented as possibly having a developmental delay," and the social worker asked Mother if she had ever been diagnosed or if she was receiving services from Regional Center of the East Bay. Mother stated she stopped going to school in ninth grade and did receive specialized services when she was in school, but she was not currently receiving regional center services. Mother "was very open to services and wanted to receive services through the Regional Center to support her in raising her children and living a better quality of life." Mother

3

was also "open to a formal psychological assessment to determine if she is developmentally delayed." The social worker referred the family to the program " 'Another Road to Safety' " (ARS) for help in obtaining housing and other services. Mother enrolled in ARS in January 2012.

On or about March 12, 2012, a different social worker received the application (prompted by the probate court) to review the prior decision not to commence dependency proceedings as to C.B. On March 13, 2012, the social worker visited maternal grandmother's home in Oakland, where Mother and the children were living. Maternal grandmother was planning to move to Stockton in April. Mother wanted to stay in Oakland and said she would find a shelter until she could get her own housing.

A Team Decision Meeting was held on March 14, 2012. Maternal grandmother did not arrive for the meeting. Mother stated she wanted to care for the children and was willing to enter a transitional housing program. Mother disclosed that, a few weeks earlier, maternal grandmother had been hospitalized after calling her counselor and telling her that she was suicidal. The outcome of the meeting was that Mother would leave maternal grandmother's home as soon as possible and enter a transitional housing program with the children. Mother, however, remained at maternal grandmother's home after maternal grandmother stated she would leave the home. Mother's ARS advocate reported to the social worker that Mother had been cooperative and was working to get documents together to apply for housing.

As noted, Agency filed the original petition in this matter on March 15, 2012. In its report for the March 19, 2012 initial hearing, Agency recommended that C.B. and J.M. "remain in the home of [Mother], pending further investigation."

At the initial hearing on March 19, 2012, Mother was taken into custody due to outstanding bench warrants. C.B. and J.M. were placed in protective custody. The following day, they were placed with a non-relative extended family member, the girlfriend of a maternal uncle. At a detention hearing on March 22, 2012, the juvenile court ordered the minors detained and set a hearing on jurisdiction and disposition for April 5, 2012.

4

In its report for the April 5, 2012 hearing, Agency recommended that the minors be made dependents of the court and remain out of the home of Mother, and that Mother receive family reunification services, including counseling. Mother remained incarcerated. The report stated Mother had "developmental delays" and struggled to manage the children on her own. Mother had mental health and behavioral problems as a teenager. Mother's criminal history included multiple arrests and grants of probation. The report noted Mother began receiving ARS services in January 2012, had been cooperative with the services and was working on finding her own housing, but had remained in the home of the maternal grandmother, despite the grandmother's substance abuse and mental health issues. Mother had relied predominantly on maternal grandmother for C.B.'s care. Agency stated that, upon Mother's release from jail, she would need to "establish a stable and safe residence and demonstrate her ability to provide appropriate care for the minors."

After the jurisdiction/disposition hearing was continued to May 21, 2012, Agency filed an addendum report, in which it again recommended that the children be made dependents of the court and remain out of the home of Mother, and that Mother receive family reunification services. The report stated that, on April 16, 2012, Mother was convicted of misdemeanor child endangerment (arising from her July 2011 arrest for failing to secure J.M.'s car seat and traveling in a vehicle driven by an intoxicated person) and placed on probation. Mother was required to take parenting classes and began the classes on May 12, 2012. Mother began having unsupervised visits with the minors in the community. The social worker referred Mother to the Ariel Outreach Mission short-term transitional housing program. Although Mother missed the first intake appointment, she attended a rescheduled appointment on May 10, 2012. Mother entered the program, but left the following day due to an issue with a staff member, which the parties subsequently resolved. Mother planned to return to the program, and the social worker had scheduled a meeting with Mother and the program director. In addition, in April 2012, Agency referred Mother for psychological testing and a parenting capacity evaluation. Agency noted Mother was taking important steps toward stabilizing

5

her living situation and using services, but stated it was important for Mother to continue to make progress in these areas and to develop her ability to care for the children.

At the May 21, 2012 hearing on jurisdiction and disposition, the juvenile court sustained the amended petition, declared C.B. and J.M. to be dependents and ordered Agency to provide family reunification services to the minors and Mother.

In an interim review report submitted for an August 2012 status hearing, Agency stated that, in June 2012, Mother was discharged from the Ariel shelter for having a physical altercation with another resident. The social worker helped Mother get into a different shelter later in June, but Mother was discharged in July for having a physical altercation with a resident of that shelter. Mother participated in a psychological evaluation and a caretaker capacity evaluation, and continued to participate in parenting classes and individual therapy.

In its report for the November 2012 six-month review hearing, Agency recommended the continuation of reunification services to Mother, and recommended C.B. and J.M. remain dependents of the court and remain in their out-of-home placement. Mother was living mainly with the maternal grandmother. Mother had completed 21 of 26 parenting classes and a psychological evaluation, continued to participate in individual therapy and would be starting anger management classes. Agency reported, however, that Mother had a limited understanding of childhood development and parenting techniques and was having a difficult time applying the information and skills she learned in the parenting classes. Agency's report stated Mother sustained a brain injury at a young age and had cognitive impairments. In September 2012, due to the pregnancy of their caretaker and her inability to continue to care for the minors, C.B. and J.M. were moved to the home of a different non-relative extended family member. At the six-month review hearing on November 2, 2012, the court found Agency had provided reasonable services and ordered the continuation of reunification services to Mother.

In a December 2012 report for a status review hearing, Agency stated that, due to concerns the social worker and minors' counsel had about the quality of the psychological evaluation that Mother had completed in August, Agency was seeking to

6

arrange a psychological evaluation by a different provider, as well as a neurological evaluation. The social worker learned it would be necessary for Mother to undergo a battery of medical tests before a neurological evaluation could be completed. As Mother did not have medical insurance, the social worker referred Mother to the Berkeley Free Clinic and Highland Hospital to get a referral for a neurological evaluation. Mother did not appear to see this referral as helpful or necessary. The social worker explained "on several occasions why this is important," but Mother was resistant to "wait[ing] at Highland Hospital 'all day . . . for no reason.' " Agency reported Mother and the minors were participating in therapeutic visits.

In its April 2013 report for the 12-month review hearing, Agency recommended that family reunification services to Mother be terminated and that a section 366.26 permanency hearing be set. Agency reported that, although Mother attempted to meet the children's needs and adequately parent them, she was not willing to try new parenting strategies, and she struggled with limit-setting and redirection during therapeutic visits. The social worker also stated Mother appeared to have "some difficulty applying and even relaying the information and skills [he] had hoped she would acquire through parenting classes, therapeutic visits, and anger management." Mother stated she had not learned anything during the therapeutic visits and did not feel she needed to work on her parenting skills. Mother had completed her parenting classes, but had participated in only nine out of 32 anger management classes that she was referred to on October 12, 2012. Mother had completed a second psychological evaluation and parenting capacity evaluation. Mother had resisted having a neurological evaluation, but eventually had scheduled one for April 11, 2013.

As to individual therapy, beginning in November 2012, Mother became inconsistent in attending her therapy sessions. Due to Mother's numerous missed appointments and late arrivals, Mother's therapist sent a letter to the social worker in March 2013 stating that (as of late February 2013) she would no longer be providing counseling services to Mother. The therapist reported that Mother "stated that she does

not have an interest or feels that she has a need for counseling and only participates because she is court mandated to [do] so."

At the 12-month review hearing on April 19, 2013, the court set the matter for a contested hearing on June 5, 2013. At the June 5, 2013 hearing, the court admitted into evidence the Agency reports prepared for the December 12, 2012 and April 19, 2013 hearings, as well as Mother's second psychological evaluation. The social worker testified at the June 5 hearing that the primary factor in his decision to recommend termination of services was Mother's difficulty in improving her parenting skills and "really being able to monitor the girls and provide a safe home for them." Mother had difficulty supervising the children during visits, and used food as a primary method to manage their behavior. During a one-hour visit to a park, the girls were "running away, into the street," while Mother "was on her cell phone and not paying attention to what they were doing." Although Mother participated in some services, her participation did not "translate[]" into changes to her parenting style. Mother did not believe she needed to learn or use different parenting techniques.

The social worker noted that the family had reported Mother was hit by a vehicle when she was five or six years old and may have sustained traumatic brain injury, but the family had no documentation of the event or its effects on Mother. The social worker's goal was to have Mother enter a regional center home. The social worker called the regional center in an effort to refer Mother for services there, but the staff told him the regional center needed documentation of the childhood injury. The social worker's understanding was that he could not proceed with a regional center referral without such documentation.

The social worker also recounted his efforts to arrange a neurological examination for Mother, beginning with asking Mother's physician to refer Mother for a neurological examination. Mother would not agree to have the social worker or a parent advocate go to her doctor appointment with her, so the social worker wrote a letter to the doctor asking for the referral. The social worker also worked to locate community clinics that would see Mother, because of Mother's concerns about long waits at Highland Hospital.

The neurological examination was scheduled on several occasions, but did not occur. As to the initial scheduled examination, Mother "didn't feel that it was necessary." Mother missed one scheduled examination because of a funeral, and one because she was briefly on bed rest. At the final appointment the social worker was able to make, the provider did not accept Mother's insurance.

When the contested hearing continued on June 6, 2013, Mother testified she would be willing to attend a neurological examination if another appointment was made with a doctor who accepted her insurance. Mother acknowledged she told the social worker she did not see why she needed to have a neurological examination. Mother testified she stopped seeing her therapist because their "time ran out." Mother also testified she told the therapist and the social worker that she did not need or want to go to therapy anymore. Mother testified she would be willing to see a therapist again. As for housing, Mother testified she was looking for rentals and was on a waiting list for low-income housing.

Mother was expecting another child. Mother testified she has experience caring for young children, as she frequently babysits for relatives, including watching a three-year-old, an eight-month-old and a two-month-old. Mother believed that, if C.B. and J.M. were returned to her care, she would be capable of caring for them and the newborn she was expecting.

In her closing argument, Mother's counsel stated she was not arguing that Agency had failed to provide reasonable services. Mother's counsel stated: "I'm not arguing reasonable services and I'm not arguing that the Agency has some sort of bias and has been unfair to [Mother] . . . ." Mother's counsel argued, however, that the court should find there was a substantial probability the children could be returned to Mother by the 18-month hearing date.

On June 12, 2013, the court announced its decision, finding that, although Mother loved the children and had participated in some services, her participation had been incomplete and she did not see the need for certain services. The court did not find there was a substantial probability the children could be returned to Mother by the time of the

9

18-month hearing. The court found reasonable services had been provided, terminated reunification services to Mother, and set a section 366.26 hearing for October 7, 2013. The court later continued the section 366.26 hearing to December 5, 2013, then to March 27, 2014, and then to July 17, 2014.

On January 21, 2014, Mother (through her counsel) filed a section 388 petition on Judicial Council Form JV-180, requesting that the court modify its June 12, 2013 order terminating reunification services to Mother and setting a section 366.26 hearing. In the petition, Mother requested that C.B. and J.M. be returned to her care, or alternatively, that she be provided with an additional six months of family reunification services. In the portion of the form asking for new information that would support a modification of the prior order ("What has happened since [the June 12, 2013 order] that might change the judge's mind?"), counsel stated Mother had given birth to another daughter, and "has since demonstrated her ability to safely care for [her]. In September of 2013, [Mother] began receiving supportive services, including therapy, parenting counseling, housing assistance, daycare and assistance with application to the Regional Center of the East Bay, from CHOP [Children's Hospital Oakland] Center for the Vulnerable Child and Through the Looking Glass." Attached to the petition were a September 2013 letter from a case manager at the Center for the Vulnerable Child, and a November 2013 letter from a family partner at Through the Looking Glass, a resource center for parents with disabilities and their children. Near the end of her letter, the family partner at Through the Looking Glass stated: "[Mother] does not seem to have been offered the full range of services she would need to be successful as a parent. It appears an early recommendation to obtain Regional Center of the East Bay services did not occur. Regional Center of the East Bay offers independent living and parenting skills support. I have submitted an application, with supporting documents, for Regional Center of the East Bay services on [Mother's] behalf."

The court set a hearing on the section 388 petition for March 14, 2014, and later continued it to March 27, 2014, and then to May 22, 2014. At the May 22, 2014 hearing, the court admitted into evidence Agency's March 27, 2014 reports (a section 366.26

10

report and an addendum report) and a May 22, 2014 status review report. Also at the May 22, 2014 hearing, Mother testified she visits with the children twice per month for one hour each time. Visits previously had been twice per week, but were reduced because "it is in adoption." Mother testified C.B. and J.M. enjoy the visits and find it difficult to end the visits.

Mother testified she started seeing a new therapist in February 2014. In her therapy sessions, she discusses the minors and "[h]ow to be a mother." She also talks with the therapist about how to find housing and how to deal with depression and anxiety. Mother had been living at a 90-day shelter since March 2014; she had been looking for housing and was on a waiting list. If she were granted custody of C.B. and J.M., they could stay in the shelter with her. Finally, Mother testified her youngest child was brought to Agency's attention due to a diaper rash that looked like bruises. As a result, Mother was receiving informal family maintenance services.

On June 3, 2014, the court denied Mother's section 388 petition, stating Mother "did not meet her burden on her 388 Petition to establish either changed circumstances or the children's best interest." Mother filed a notice of appeal (No. A142238) challenging the order denying her section 388 petition.

At the section 366.26 hearing on July 17, 2014, the court admitted into evidence the reports Agency had prepared for the various scheduled dates for that hearing. A report filed July 2, 2014 stated that Mother's youngest child was detained on June 13, 2014, based in part on allegations that, on June 2, 2014, Mother was intoxicated and had her youngest daughter with her when she got into an altercation with a convenience store owner and stole $900. The following day, Mother was again intoxicated and vomited on herself while holding her youngest child. At the July 17, 2014 hearing, Mother and the social worker testified about Mother's visits with C.B. and J.M., including occasions on which the social worker believed Mother had difficulty redirecting the children and setting limits for them.

On July 31, 2014, the court found the minors were adoptable and terminated Mother's parental rights. Mother filed a notice of appeal (No. A142718) challenging the

11

court's order terminating parental rights. We granted Agency's motion to consolidate Mother's two appeals.

## II. DISCUSSION

### A. The Denial of Mother's Section 388 Petition

In her appeal of the juvenile court's denial of her section 388 petition, Mother contends Agency failed to provide her with reasonable reunification services because it did not refer her to the regional center or help her apply. Mother contends the juvenile court therefore was incorrect in finding at the 12-month review hearing in June 2013 that Agency had provided reasonable services. Mother argues her section 388 petition (filed in January 2014) showed she had not received reasonable services, and the court abused its discretion by denying the section 388 petition to reinstate services.

Under section 388, a parent may petition to modify a prior order "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a)(1); see Cal. Rules of Court, rule 5.570(a).) The petitioner must show a change of circumstances or new evidence and that the proposed modification is in the child's best interests. (See *In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) We review the denial of a petition for modification under section 388 for abuse of discretion. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.)

We reject Mother's argument that the juvenile court abused its discretion in denying her section 388 petition. First, we agree with Agency that Mother forfeited the contention she now raises on appeal (i.e., that Agency did not provide reasonable services) because she did not present it to the juvenile court. In dependency matters, as in other cases, "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on another ground as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.) As noted, in her section 388 petition, Mother argued the court should modify its June 2013 order terminating services, *not* because Agency had failed to provide reasonable services, but because Mother's circumstances had changed *since the entry of the June 2013 order* (i.e., Mother had given birth to another daughter, had demonstrated her ability to care for her, and had begun receiving supportive services

from the Center for the Vulnerable Child and Through the Looking Glass). Although the family partner at Through the Looking Glass suggested near the end of her letter (attached to Mother's section 388 petition) that Mother had not received the full range of necessary services, including a referral to the regional center, Mother did not assert in her petition that Agency had failed to provide reasonable services or that the juvenile court had erred in finding the services provided were reasonable.

Similarly, at the hearings on the section 388 petition, Mother's counsel did not argue Agency failed to provide reasonable services. At the May 22, 2014 hearing on the section 388 petition, when the court asked what changed circumstances supported the petition, Mother's counsel responded by focusing on events that had occurred *since the June 2013 order* terminating services: "I am arguing that the changed circumstance is the continued out-of-custody situation with the other child and then the mother continuing to work towards return by looking for additional housing and consistently visiting and being gravely restricted in her ability to see her children to work towards return." Mother's counsel did not argue that Agency had failed to provide reasonable services, or that such a failure provided a basis for granting the section 388 petition. In ruling on the section 388 petition, the juvenile court did not abuse its discretion by failing to adopt a theory that Mother never presented.[2]

Second, even if Mother did not forfeit her challenge to the juvenile court's finding that Agency offered her reasonable services, we conclude that challenge fails on the merits. "Typically, when a child is removed from a parent, the child and parent are entitled to 12 months of child welfare services to facilitate family reunification. These services may be extended to a maximum of 18 months. (§ 361.5, subd. (a).) If, at the 12–month hearing, [Agency] does not prove, by clear and convincing evidence, that it has

---

[2] On appeal, Mother does not contend the trial court abused its discretion by rejecting the argument Mother made in support of her section 388 petition in the juvenile court (i.e., her claim that her circumstances had changed since the June 2013 hearing, as evidenced by her care for her newborn daughter and her participation in services provided by the Center for the Vulnerable Child and Through the Looking Glass).

provided reasonable services to the parent, family reunification services must be extended to the end of the 18–month period." (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345 (*Amanda H.*); see § 366.21, subd. (g)(4).)[3] The evidence of reasonable services must be " ' "so clear as to leave no substantial doubt" ' " (*In re Maria S.* (2000) 82 Cal.App.4th 1032, 1039) and " 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306.) We review the juvenile court's finding of reasonableness of offered services under the substantial evidence test. (*Amanda H., supra,* at p. 1346.) "[O]ur sole task on review is to determine whether the record discloses substantial evidence which supports the juvenile court's finding that reasonable services were provided or offered" (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762), bearing in mind the heightened burden of proof in the trial court of clear and convincing evidence (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971 (*Alvin R.*)). Substantial evidence is that which is reasonable, credible and of solid value. (*Ibid.*)

Mother contends Agency did not offer her reasonable services because it did not refer her to a regional center or help her apply. Regional centers are designed to provide services to persons with developmental disabilities.[4] Under section 4512, subdivision (a),

---

[3] For a child who was under three years of age when she was removed from parental custody (as both C.B. and J.M. were), the court may in some circumstances terminate services at the *six-month* review hearing. (§ 366.21, subd. (e); see § 361.5, subd. (a)(1)(B).) A prerequisite for such action is that the agency prove by clear and convincing evidence at the six-month review hearing that the parent has "failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21, subd. (e).) At the six-month review hearing in this case, the court did not make such findings; instead, as noted, the court adopted Agency's recommendation to continue reunification services to Mother.

[4] (See § 4620, subd. (a) ["In order for the state to carry out many of its responsibilities as established in this division, the state shall contract with appropriate agencies to provide fixed points of contact in the community for persons with developmental disabilities and their families, to the end that these persons may have access to the services and supports best suited to them throughout their lifetime. It is the intent of the Legislature in enacting this division that the network of regional centers for persons with developmental disabilities and their families be accessible to every family in

14

" '[d]evelopmental disability' means a disability that originates before an individual attains 18 years of age; continues, or can be expected to continue, indefinitely; and constitutes a substantial disability for that individual." The services available to such persons through the regional centers include "specialized services and supports or special adaptations of generic services and supports directed toward the alleviation of a developmental disability or toward the social, personal, physical, or economic habilitation or rehabilitation of an individual with a developmental disability, or toward the achievement and maintenance of independent, productive, and normal lives"; these services can include "training for parents with developmental disabilities." (§ 4512, subd. (b).) A person believed to have a developmental disability is eligible for initial intake and assessment services in the regional centers. (§ 4642, subd. (a).) Mother argues that, because Mother's apparent cognitive limitations suggested she was eligible for regional center services, Agency's reunification plan and services were inadequate because they did not include a referral to the regional center.

We disagree. The purpose of reunification services is to " ' "facilitate the return of a dependent child to parental custody." ' " (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1244.) The " 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.] To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.) "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be

need of regional center services."]; *In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1329, fn. 8.)

15

provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547; see *Alvin R., supra,* 108 Cal.App.4th at p. 972 ["[r]eunification services need not be perfect"].)

The Agency is required "to 'make a good faith effort to develop and implement a family reunification plan . . . [with] the objective of providing such services or counseling "as will lead to the resumption of a normal family relationship." ' " (*In re Jasmon O., supra,* 8 Cal.4th at p. 424.) Here, Agency designed an appropriate reunification plan and offered appropriate services to Mother, including parenting classes, anger management classes, individual therapy, visitation with C.B. and J.M. (including therapeutic visitation), referrals to housing assistance programs, and two psychological and parenting capacity evaluations.

As to Mother's claim that Agency should have referred her to the regional center, Mother is correct that Agency became aware, before and during the dependency proceedings, that Mother might have developmental disabilities. During Agency's 2010 investigation of Mother, maternal grandmother told the social worker that Mother was hit by a truck when she was five years old and had mental health issues. The social worker who conducted Agency's September 2011 investigation of Mother recognized she might have developmental disabilities, and discussed with her the possibility of obtaining regional center services. After the instant dependency proceeding was commenced in March 2012, Agency stated in its April 2012 report for the hearing on jurisdiction and disposition that Mother had "developmental delays," struggled to manage the children on her own, and had mental health and behavioral problems as a teenager. A subsequent report stated Mother had sustained a brain injury at a young age and had cognitive impairments.

Contrary to Mother's contention, however, Agency attempted to follow up on this issue and to obtain regional center services or other appropriate services for Mother. The social worker testified at the 12-month permanency hearing that, although the family had reported Mother was hit by a vehicle when she was five or six years old and may have sustained traumatic brain injury, the family had no documentation of this incident or its

16

effects on Mother. The social worker testified that his goal was to have Mother enter a regional center home. The social worker called the regional center in an effort to refer Mother for services there, but the staff told him the regional center needed documentation of the childhood injury. (See § 4512, subd. (a) [developmental disability means a disability originating before an individual attains 18 years of age].) The social worker's understanding was that he could not proceed with a regional center referral without such documentation.

As noted, the social worker also attempted to arrange a neurological examination for Mother. The social worker wrote a letter to Mother's physician asking for a referral to a neurologist (since Mother would not agree to have the social worker or a parent advocate go to her doctor appointment with her), and worked to locate community clinics that would see Mother, given her concern about waiting at Highland Hospital. The neurological examination was scheduled on several occasions, but did not occur. The initial scheduled examination did not happen because Mother did not feel it was necessary. Mother missed another scheduled examination due to a funeral and one because she was briefly on bed rest. At the final appointment the social worker was able to make, the provider did not accept Mother's insurance.

The social worker's active efforts in this area distinguish this case from *In re K.C.* (2012) 212 Cal.App.4th 323, 329, cited by Mother, in which the appellate court found the social services agency had not provided sufficient assistance to a parent in obtaining a psychotropic medication evaluation. Moreover, to the extent Mother resisted participating in offered services, such as the proposed neurological evaluation, such resistance limited Agency's ability to provide her with additional services that might have been warranted based on the results of a completed neurological evaluation. (See *In re Christina L.* (1992) 3 Cal.App.4th 404, 417–418 [parent's resistance to participating in services supported conclusion agency made a good faith effort to provide services under the circumstances].)

Mother, however, criticizes the social worker's efforts. She contends the social worker was incorrect in believing (as he was told by regional center staff) that it was

necessary to provide documentation that Mother's impairments originated in childhood. Similarly, she argues it was "neither necessary nor reasonable" for the social worker to attempt to arrange a neurological examination with a private clinician, and the social worker should instead have submitted an application to the regional center and allowed it to conduct its own evaluations of Mother. (But see § 4643, subd. (b) [in determining if an individual meets the definition of developmental disability, regional center may consider evaluations and tests, including "other tests or evaluations that have been performed by, and are available from, other sources"].) Finally, Mother suggests Agency might have had information supporting a referral to the regional center in its own records, including records of prior dependency proceedings occurring when Mother was a child.

But these criticisms do not establish a lack of substantial evidence supporting the juvenile court's finding that Agency offered reasonable services to Mother. Even assuming Mother is correct that a person with a more nuanced understanding of regional center practices and requirements might have been able to secure additional services for Mother, the social worker's testimony about his efforts in this area provides ample evidence supporting a conclusion that Agency made a good faith effort to design and implement a case plan appropriate for Mother (*In re Jasmon O., supra,* 8 Cal.4th at p. 424), and that the services Agency did provide were reasonable under the circumstances (*In re Misako R., supra,* 2 Cal.App.4th at p. 547).

## B. The Termination of Mother's Parental Rights

Mother raises two challenges to the juvenile court's order terminating her parental rights. First, Mother reiterates the argument she made in challenging the court's denial of her section 388 petition—she argues Agency failed to provide reasonable services because it failed to refer her to the regional center and help her apply; the juvenile court therefore erred in denying Mother's section 388 petition to reinstate services; and because the order denying the section 388 petition must be reversed, the subsequent order terminating parental rights must also be reversed. For the reasons discussed in part II.A above, we reject this argument. The court did not err in terminating services, setting the section 366.26 hearing, and denying Mother's section 388 petition.

18

Mother's second challenge to the court's order terminating her parental rights is that there is no substantial evidence supporting the court's determination C.B. and J.M. are likely to be adopted within a reasonable time. We disagree.

"Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) To select adoption as a child's permanency plan at a section 366.26 hearing, the juvenile court must find by clear and convincing evidence that it is likely the child will be adopted within a reasonable time. (§ 366.26, subd. (c)(1); *In re Zeth S.* (2003) 31 Cal.4th 396, 406.) The fact the child is not yet placed with a family prepared to adopt the child "shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." (§ 366.26, subd. (c)(1); *In re B.D., supra,* 159 Cal.App.4th at p. 1231.) The adoptability inquiry "focuses on the *minor,* e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' " (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) If the court finds it is likely the child will be adopted, it must order adoption unless termination of parental rights would cause serious detriment to a child under one or more statutory exceptions (which Mother does not contend are applicable). (§ 366.26, subd. (c)(1); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 574.)

When the juvenile court's adoptability finding is challenged on appeal, we determine "whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time." (*In re B.D., supra,* 159 Cal.App.4th at p. 1232.) We draw all reasonable inferences supporting the juvenile court's adoptability finding and resolve any evidentiary conflicts in favor of the court's order. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 576.)

The record that was before the juvenile court at the section 366.26 hearing in July 2014 contains substantial evidence supporting the court's finding that C.B. and J.M. are

likely to be adopted.[5]  As noted above, at the July 17, 2014 hearing, the court admitted into evidence the Agency's section 366.26 reports.  In its reports, Agency concluded C.B. and J.M. were adoptable and adoption was the appropriate permanent plan.  Agency reported that adoption assessments were conducted by the social worker and a child welfare adoptions supervisor on March 5, 2013 and September 4, 2013, and the minors were found to be adoptable.

The evidence before the court supported the Agency's conclusion that C.B. and J.M. were adoptable.  As noted above, the adoptability inquiry focuses on the child, including whether the minor's age, physical condition and emotional state make it difficult to find a person willing to adopt the child.  (*In re Sarah M., supra,* 22 Cal.App.4th at p. 1649.)  A child's young age, good physical and emotional health, intellectual growth, and ability to develop interpersonal relationships are attributes that may support a determination the child is likely to be adopted within a reasonable time.  (*Id.* at p. 1651.)

C.B.'s and J.M.'s young ages and good physical health support a finding of adoptability.  The section 366.26 reports filed in March 2014 and July 2014 noted that C.B. was four years old and J.M. was three years old.  Agency also reported the girls "are

_____

[5] In May 2015, after these appeals were fully briefed, Agency filed motions asking this court to (1) consider postjudgment evidence that C.B. and J.M. were placed in an approved adoptive home in September 2014, and (2) dismiss as moot the portion of Mother's appeal challenging the juvenile court's adoptability finding.  Mother opposed the motions.  Although Code of Civil Procedure section 909 permits an appellate court to consider postjudgment evidence, our Supreme Court has instructed that this appellate authority " 'should be exercised sparingly,' " as "[i]t has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' " (*In re Zeth S., supra,* 31 Cal.4th at p. 405.)  " '*Absent exceptional circumstances, no such findings should be made.*' " (*Ibid.*)  Here, because we conclude the record before the juvenile court in July 2014 contains substantial evidence supporting its adoptability finding, we need not address whether consideration of postjudgment evidence on the adoptability issue is appropriate in the circumstances of this case.  We deny Agency's motions for consideration of postjudgment evidence and for partial dismissal of Mother's appeal.

both in good health, with no significant developmental issues." While C.B. takes clonidine for attention deficit hyperactivity disorder (ADHD) and her blood pressure is routinely monitored as a result, her physician reported that " '[h]er blood pressure remains stable and within normal limits.' " Although J.M. was diagnosed with a heart murmur prior to dependency, her physician continued to monitor this condition and had no current concerns. Mother does not dispute the girls are physically healthy.

As to emotional health, Agency reported: "[J.M.] has no significant emotional or behavioral issues. [C.B.] has some behavioral issues, including aggressive and defiant behavior, although she has shown some improvement since starting medication for ADHD. She needs a caregiver who can consistently engage in good limit setting." Agency stated J.M. "typically has a warm and friendly disposition, but gets jealous if [C.B.] gets more attention or any different treatment. Recently she has begun imitating [C.B.'s] defiant and impulsive behaviors."

Mother argues C.B. has significant emotional and behavioral problems that would make it difficult to place her for adoption. Mother does not argue J.M. has similar problems, but Mother contends that, since C.B. and J.M. are a bonded sibling set who were being considered for adoption together, C.B.'s problems make it difficult to place the girls for adoption.[6] Drawing all reasonable inferences in support of the judgment, the evidence in the record supports a conclusion that, despite C.B.'s difficulties, she was likely to be adopted, in light of the efforts that were being made to address those difficulties and her other positive traits.

_____

[6] Since we conclude there is substantial evidence C.B. is likely to be adopted, we need not address Mother's argument that a contrary finding as to C.B. would preclude a finding of adoptability as to J.M. where, as here, Agency is seeking to place the siblings for adoption together. (Compare *In re B.D., supra,* 159 Cal.App.4th at p. 1233 [finding a lack of evidence to support a finding that three siblings were likely to be adopted as a sibling group within a reasonable time] with *In re I.I.* (2008) 168 Cal.App.4th 857, 872 & fn. 3 [statutory and case law require determination of adoptability of a child as an individual; disagreeing with *In re B.D., supra,* "to the extent it held that a finding of adoptability in the context of a bonded sibling group requires a finding that the children are likely to be adopted *as a sibling group* within a reasonable time"].)

21

As Mother notes, Agency's reports disclose C.B. had speech delays. But, as Mother acknowledges, the speech delays appeared to have decreased over time. C.B.'s foster parent noted that C.B.'s speech difficulties had decreased since C.B.'s placement with her, and the social worker and the foster parent were working to obtain appropriate speech therapy for C.B. in school.

Agency's reports also state that C.B. had "some behavioral issues" and difficulty processing changes in her environment, and she was participating in therapy to assist with these issues. Agency reported: "C.B. is generally happy and inquisitive. She seems to indiscriminately attach and does not experience typical 'stranger danger' for a child her age. [C.B.] is very active and has some behavioral issues; for instance, the foster parent has found that she must put [C.B.] into her car seat first, or [C.B.] will run into the street while the foster parent is dealing with [J.M.] [C.B.] is not always redirectable and can present challenges to caregivers, including slapping her sister, scratching, and biting. [¶] [C.B.] seems to process more slowly than other children her age, particularly around transitions. . . . The therapist . . . states that breaking down everything step by step seems to help [C.B.] Sometimes she may not follow directions and will tantrum, but she seems to be learning." Finally, Agency reported that, as noted above, C.B. was diagnosed with ADHD and had been prescribed clonidine. Agency stated that C.B. "is easily dysregulated and can be triggered easily by any transitions, external stimuli (such as loud noises), or a lack of structure."

Despite these challenges, Agency concluded, and the juvenile court reasonably could conclude based on the evidence, that C.B. was likely to be adopted. C.B. was still young (four years old) and was receiving medical and therapeutic assistance to help address her difficulties. As noted, Agency reported C.B. had shown some improvement in her behavior since starting medication for ADHD. C.B.'s therapist also stated that breaking down tasks and transitions seemed to help C.B., and despite her difficulty in following directions, she seemed to be learning. The therapist stated C.B. "thrives when she can predict and anticipate changes in her environment," and responds well "when she is positively praised for specific actions she is completing that are desirable and when

22

behavioral expectations of her are clear, concrete and anticipated." Consistent with these findings, Agency (in stating its conclusion that the girls are adoptable) stated C.B. "needs a caregiver who can consistently engage in good limit setting."

This evidence that C.B. can respond well to appropriate care and assistance supports the juvenile court's finding she is adoptable. This is not—as Mother contends—a case like *In re Asia L.* (2003) 107 Cal.App.4th 498, 510–512, where the appellate court found insufficient evidence the minors were likely to be adopted within a reasonable time because of their severe emotional and developmental problems. Here, the court reasonably could conclude that, in light of C.B.'s young age, good physical health, generally happy disposition, and amenability to assistance with her emotional and behavioral challenges, it was likely she would be adopted within a reasonable time. (See *In re I.I., supra,* 168 Cal.App.4th at p. 871 [despite negative behaviors, children's positive traits, including good physical health and affectionate dispositions, supported finding of adoptability].)

Because the evidence supports a conclusion C.B. and J.M. were generally adoptable, the fact Agency had not yet (at the time of the section 366.26 hearing in July 2014) placed them in an approved adoptive home does not undercut the juvenile court's finding of adoptability.[7] (§ 366.26, subd. (c)(1); *In re B.D., supra,* 159 Cal.App.4th at p. 1231.)

### III. DISPOSITION

The juvenile court's orders denying Mother's section 388 petition and terminating Mother's parental rights are affirmed.

---

[7] Agency's report for the July 17, 2014 hearing stated that, on June 25, 2014, the social worker met with a family interested in adoption. Agency stated: "The prospective caregiver wishes to move forward with visitation and placement for adoption."

23

_____

Streeter, J.

We concur:

_____

Reardon, Acting P.J.

_____

Rivera, J.

A142238, A142718/*In re C.B.*